**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARY E. ROBINSON,**

          **Plaintiff,**

      **v.**                                                    **7:09-CV-1209**

**PURCELL CONSTRUCTION CORPORATION,**
**RICK DIBBLE, and CLIFF HILTON,**

          **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I.     INTRODUCTION**

On October 28, 2009, Plaintiff commenced this action *pro se* with the filing of a

Complaint asserting three causes of action: (1) Sexual Harassment under Title

VII of the Civil Rights Act of 1964 ("Title VII"); (2) Discrimination under the Americans with

Disabilities Act ("ADA"); and (3) Retaliation.  Defendants filed their Answer with Affirmative

Defenses on January 28, 2010.   Plaintiff thereafter retained counsel and, on August 7,

2010, filed an Amended Complaint asserting eight causes of action: (1) Hostile Work

Environment under Title VII against Defendant Purcell; (2) Hostile Work Environment

under the ADA against Defendant Purcell; (3) Discrimination under Title VII against

Defendant Purcell; (4) Discrimination under the ADA against Defendant Purcell; (5)

Retaliation under Title VII against Defendant Purcell; (6) Retaliation under the ADA

1

against Defendant Purcell; (7) Tortious Interference against Defendants Dibble and Hilton; and (8) *Prima Facie* Tort against Defendants Dibble and Hilton. On August 23, 2010, Defendants filed an Answer with Affirmative Defenses to the Amended Complaint.

Now before the Court is Defendants' Motion for Summary Judgment seeking to dismiss the case in its entirety. See dkt. no. 42. Plaintiff has opposed the motion, see dkt. nos. 46-57, and Defendants have filed a reply. Dkt. no. 58.

## II.    STANDARD OF REVIEW

The Court will apply the well-settled standards for deciding summary judgment motions in Title VII and other discrimination actions. See Fed. R. Civ. P. 56(a); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Bracci v. N.Y.S. Dept. of Correctional Services, 2005 WL 2437029, at * 1 (N.D.N.Y. Sept. 30, 2005) (McAvoy, S.J.).   These standards will not be repeated. Suffice it to say that where, as here, the intent of one party is in question but there is no direct evidence of discrimination, the Court must carefully examine the reasonable inferences that could be drawn from the totality of the circumstantial evidence and be cautious about granting summary judgment. Schiano v. Quality Payroll Sys., 445 F.3d 597, 603 (2d Cir. 2006). Nonetheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

## III.    BACKGROUND

All facts are viewed in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007). Hearsay will not be considered on this motion. See Fed. R. Civ. P. 56(c)(4).

Plaintiff was hired by Purcell Construction Corp. ("Purcell") in April 2004 as a laborer and laid off that same year due to lack of work.  Def. Stat. of Mat. Facts ¶¶ 2, 6.[1] She was rehired in January 2006 and worked at Purcell's Fort Drum military base work site.  Upon being rehired, except for one period discussed below when Plaintiff was paid a higher "mason's wage," Plaintiff was paid a "carpenter's wage."[2]  In 2008, Plaintiff  began working on a cleanup crew where the circumstances underlying this action occurred.  The cleanup crew was supervised by Neal Moser, a Superintendent at Purcell.  Def. Stat. of Mat. Facts ¶ 10.  In addition to Plaintiff, the cleanup crew consisted of Lisa McIntosh, Defendant Rick Dibble, and Defendant Cliff Hilton. Id.  Hilton was the foreman on the cleanup crew.[3]  The cleanup crew conducted demolition and cleanup of several buildings at Fort Drum. Id.

Plaintiff suffers from anxiety, depression, and post-traumatic stress disorder for which she received treatment and takes medication.[4]  Plaintiff reported her medication and condition to her initial foreman Bob Kaler in 2007.  After she was moved to the cleanup

---

[1]Where Defendants' Statement of Material Facts is cited, it is in situations where Plaintiff has either admitted the proposition in Defendants' Statement, or has failed to provide sufficient support for her opposition to the statement. See N.D.N.Y. L.R. 7.1(a)(3).

[2]Plaintiff contends that she was re-hired for, and worked in, a "carpentry position."  Defendant contends that Plaintiff was re-hired as a laborer, did laborer's work, but that at the time all laborers were paid the higher carpenter's wage in order to provide more flexibility with assignments at the Fort Drum job site. See Schneider 3/4/11 Aff., ¶ 3.

[3]Defendants contend that Hilton was not a foreman or a supervisor.  However, an affidavit from Neal Moser, submitted in connection with the underlying administrative investigation, refers to Hilton as a foreman. Another co-worker, Lisa McIntosh, stated at her deposition that, when doing demolition work, Hilton was the one who told them what to do.  For purposes of this motion, the Court will consider Hilton a foreman who directed the cleanup crew's tasks, although Plaintiff concedes that Hilton did not have the authority to hire or fire and that she did not know whether he had the authority to discipline or reprimand other workers. See Pl. Dep., pp 117-118.

[4]Plaintiff also suffers from carpal tunnel disorder and tendinitis, but Plaintiff has not alleged that these conditions form part of her ADA claim.

crew, Plaintiff reported "an increase in her medication" to Hilton.

In February 2008, Plaintiff asked Dibble for assistance with a job related task.  He responded: "What do you want bitch?"  This occurred in front of another male co-worker.  Plaintiff was upset by the statement.  Later that day, Dibble called Plaintiff a "witch" in front of a different male co-worker.

Within a few days of the name calling, Dibble stated to Plaintiff in front of another male co-worker that Plaintiff "must be ragging it today." Plaintiff was upset by the comment because she understood it to be making a reference to her menstrual cycle.  Plaintiff reported Dibble's comments to Hilton.  Hilton replied: "You are too hyper on your medicine" and that "you let too much bother you."  Hilton shook his head in a manner that Plaintiff interpreted as being disgusted with Plaintiff for reporting the comments.  Nothing was said or done about Plaintiff's complaint.

In March 2008, Plaintiff informed Hilton, Dibble, and another co-worker that her prescribed medication for anxiety and depression had been increased because of the stress and anxiety she was feeling from the comments made to her at work and her perception that she had no support from her employer.  Around this time, Dibble stated to Plaintiff in front of several co-workers:  "You must not've taken your meds today."  Plaintiff again complained to Hilton, and Hilton again stated that Plaintiff let too much bother her.

At the end of March or the beginning of April 2008, Dibble walked up to Plaintiff and asked her if she knew the definition "of a cunt."  Later that day, Dibble walked up to Plaintiff again, and in the presence of co-workers, said the same thing a second time.  Plaintiff believed that Dibble's derogatory comments were specifically directed at her and were not meant as jokes. The comments upset and embarrassed Plaintiff.  Plaintiff

4

reported Dibble's comments to Dave Jackson, who was a "team leader" at Purcell at the time.  Jackson, Dep. p. 16 (Jackson was not a foreman at the time), p. 22 (same). Jackson reported what Plaintiff told him to Neal Moser, who was a Superintendent at Purcell and the supervisor for the cleanup crew. Id. pp. 18-19.  Jackson then told Dibble to stay away from Plaintiff until Moser talked to him, and Dibble responded "OK." Id. p. 20. On the same day, Moser met with Dibble and told him that sexual harassment was not tolerated and directed him not to use inappropriate language again or disciplinary action would be taken. Def. Stat. Mat. Facts, ¶ 18.  The next day Plaintiff tried to report the incident to Hilton but before she could tell him what occurred, Hilton yelled at her:  "Do your job or go home."  At the end of the shift, Plaintiff informed Hilton what Dibble had said and that she was uncomfortable working with Dibble.

On April 1, 2008, Plaintiff injured her lip after walking into a piece of metal on a job site.  Hilton brought her to the hospital and the doctor glued her split lip together.  Hilton stated: "You should've glued her lips shut."  The next day, believing that Hilton and Dibble were making jokes about her injury, Plaintiff commented that she did not walk around demanding respect, but that she was not going to be disrespected either.  Plaintiff contends that the following day, her job duties "were altered for the worse in that I had to go to another room and sweep floors while Defendant Hilton and another co-worker yanked out old ceilings which I should have been doing. I felt isolated and ostracized."  Pl. Aff. ¶ 24.

Hilton would not permit Plaintiff to operate equipment even though she was qualified to so.  Plaintiff also contends that "[t]hroughout the year, Defendant Hilton told me that I had a 'fat ass' in front of other coworkers."  Pl. Aff. ¶ 26.

5

In the middle of April 2008, Plaintiff reported "everything" to Sandra Crabb, a Safety Officer at Purcell. Pl. Aff. ¶ 28.  During this conversation, Plaintiff asked Crabb whether the insurance would cover a psychiatrist and/or therapy because of the issues at the job site. Id. [5]

In May 2008, Plaintiff was transferred to the brick washing crew where she did not have to work with Dibble.  After one day of being on the brick washing crew, Plaintiff complained because she was not paid at the higher "mason's wage."  This was immediately corrected by Purcell.  Plaintiff also reported her complaints about Dribble and Hilton to her new foreman, Keith Ritz.  Plaintiff contends that around this time her request for "properly fitted gloves" was denied, resulting in her sustaining an "acid wash" burn to her arm.

In late June or early July 2008, after Plaintiff was injured on the brick washing crew, she was moved back to the cleanup crew for one or two days. Def. Stat. Mat. Facts ¶ 19. When Plaintiff was working on the cleanup crew during this period, Plaintiff was instructed by Hilton to clear out a building and sweep it for tiling.  Plaintiff contends that she "was not given adequate tools to perform this assignment and [Hilton] had removed items that would have expedited this job." Pl. Aff. ¶ 36.[6]  When she did not finish the job in a timely manner, Hilton accused Plaintiff of not working and yelled "in [her] face, 'You need to do your job.'" Id.  Hilton then walked away "mumbling" and began "vocally complaining about [Plaintiff] to others." Id.  Plaintiff believed that Hilton had intentionally given her an

---

[5] Plaintiff does not indicate what Crabb's response was to this question. See Pl. Aff. ¶ 28.

[6] Plaintiff does not indicate what tools were absent, what the "items" were that Hilton purportedly removed, or whether she witnessed Hilton removing any items or tools.

assignment "which he knew could not be completed alone or without the necessary equipment and tools and then yelled at me for not doing my job." Id.  Plaintiff also contends that Hilton "would peer into the windows of the building and stare at [Plaintiff] every time he'd drive by" which made her "uncomfortable."[7]

On the day that Hilton yelled at Plaintiff for not doing the sweeping job quickly enough, Plaintiff complained to Carl Schweitzer, one of the supervisors at Purcell.  She contends that she was told by Schweitzer that she should have "never been put back on that crew." Id. ¶ 37.

In June or July 2008, Plaintiff asked James Kingsley, the Personnel Director of Purcell, for "follow-up treatment" for her lip.  Plaintiff contends that she was told that she would be responsible for her own follow up treatment,[8] and she further contends that "male workers are not treated this way with their injuries." Pl. Aff. ¶ 35.  Defendants contend that Plaintiff asked for laser cosmetic surgery for her lip injury and was told that the employer would have to check to see whether it would be covered under a Worker's Compensation claim, which it was.[9]  Schneider Aff., at. ¶ 10.

In July 2008, Kingsley called Plaintiff into his office and asked Plaintiff about her medication and whether it made her "all weird." Pl. Aff. ¶ 38. Plaintiff advised Kingsley that she was "fine" on her medication. Id.  Plaintiff also reported to Kingsley that "bad things

---

[7]Plaintiff does not give a time frame when this occurred, a frequency of occurrence, or whether Hilton's "peering" in the windows was part of his job as foreman.

[8]Plaintiff's initial hospital bills from here lip injury were paid by Purcell. Def. Stat. Mat. Facts, ¶ 21.

[9]Plaintiff contends that even though the follow up care was paid for by Worker's Compensation, her Worker's Compensation claim was not submitted until two months after she was discharged on August 1, 2008.

7

had been said to [her] and that [she] did not want to be put back on the crew with Defendants Dibble and Hilton." Id.  She would not tell Kingsley what had been said because she feared being retaliated against by Hilton or Dribble if they were disciplined, but she told Kingsley that she just wanted to be left alone and to be treated with respect.

On August 1, 2008, at the end of the work day, two supervisors, Carl Schweitzer and "Jason," came up to Plaintiff in the Purcell parking lot and stated: "You're done." Id. ¶ 40.  They purportedly told Plaintiff that she was being discharged because "the brick washing [was] done" and because she was unable "to get along with others." Id.  Plaintiff then spoke with Kingsley who purportedly told her that "they all had decided it was in the best interests of the company" to discharge Plaintiff. Id.  On August 4, 2008, Plaintiff spoke with Christina Schneider, the Chief Financial Officer at Purcell.  Plaintiff asked: "How is it I'm the one harassed but also the one that is let go?" Id. ¶ 41. Schneider replied that it was not about the harassment but that they simply had nowhere to place Plaintiff because no one wanted to work with her because she could not get along with others. Id.

Plaintiff asserts that Purcell hired additional people in her "job title right after [she] was fired," and that Purcell hired male employees before and after she was discharged. Id. ¶¶ 44-45.  In support of these propositions, Plaintiff cites to statistical records provided by Purcell at the underlying administrative proceeding.  Defendants contend that the reports that Plaintiff cites to included Purcell workers in Virginia and New York, and was a "snapshot in time" for the week that ended August 31, 2008 but which did not reflect the end of year statistics for the company.  See Schneider 4/27/11 Aff., ¶ 3.  Rather, Defendants assert, the downturn in the economy together with the ending of the majority of work at the Fort Drum work site caused Purcell to lay off 66 workers in New York,

8

including Plaintiff, Dibble, and Hilton.  Defendants point out that of those 66, only 5 were subsequently rehired by Purcell.  Id. ¶¶ 6-7.   Of the four person cleanup crew that Plaintiff worked on at Purcell, only Lisa McIntosh, a female, currently works at Purcell.  Id. ¶ 7.  As to other new hires at Purcell, Defendants maintain these were skilled position of masons and dry wallers, and that Plaintiff did not possess the skills to work in these positions. Id. ¶¶ 8-9.  Defendants note that although Plaintiff was paid at the mason's rate when she worked with the brick washing crew, she did not have masonry skills and, therefore, she could not have done the work for which a male mason was hired shortly after she was laid off.  Moreover, the project Plaintiff had been working on with the brick washing crew was nearing completion, and the decision to lay-off Plaintiff came from her brick washing Superintendent in accordance with Purcell's standard practice. Schneider 03/04/11 Aff. ¶10.

On August 26, 2008, Plaintiff filed a charge of discrimination and retaliation with the New York State Division of Human Rights.  After an investigation by the Division of Human Rights and a hearing, the Division of Human Rights issued a Determination and Order on February 12, 2009 finding that there was no probable cause to believe that Purcell had engaged in or was engaging in unlawful discriminatory practices. See NYSDHR Decision and Order, annexed as Exhibit E to the Defendants' Answer with Affirmative Defenses.  The EEOC issued a right to sue letter on August 31, 2009.  This action followed.

## IV.    DISCUSSION

### a.    Hostile Work Environment Claims

Plaintiffs First and Second Causes of Action are against Defendant Purcell alleging claims of hostile work environment under Title VII and the ADA.[10] To establish a claim of hostile work environment under either statue, a plaintiff must prove that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Clark County School District v. Breeden, 532 U.S. 268, 270 (2001); Harris v. Forklift Sys., 510 U.S. 17, 21 (1993); Quinn v. Green Tree Credit Corp., 159 F .3d 759 (2d Cir.1998); see Hendler v. Intelecom USA, Inc., 963 F. Supp. 200, 208 (E.D.N.Y.1997)(analyzing ADA hostile work environment claim under the same standard utilized in Title VII cases).   A "hostile work environment claim will succeed only where the conduct at issue is so 'severe and pervasive' as to create an 'objectively hostile or abusive work environment,' and where the victim 'subjectively perceive[s] the environment to be abusive.'" Richardson v. N.Y. State Dep't. of Correctional Serv., 180 F.3d 426, 436 (2d Cir. 1999), *abrogated on other grounds by* Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed.2d 345 (2006)(quoting Harris, 510 U.S. at 21-22). The objective aspect of this test is judged by a reasonable person standard. Id.  To

---

[10]The Court assumes, *arguendo*, that the Second Circuit recognizes a hostile work environment cause of action under the ADA. See, e.g., Braun v. Securities Sec. Services USA. Inc., 2009 WL 150937, *8 (E.D.NY. January 20, 2009)("Although the Second Circuit has not determined whether the ADA gives rise to a cause of action for hostile work environment, see Bonura v. Sears Roebuck & Co., 62 F. App'x. 399, 400 n. 3 (2d Cir. 2003), several district courts in this circuit have held that such claims are cognizable. See, e.g., Hendler v. Intelecom USA, Inc., 963 F. Supp. 200, 208 (E.D.N.Y.1997) (analyzing ADA hostile work environment claim under the same standard utilized in Title VII cases); Hudson v. Loretex Corp.,1997 WL 159282, at *2–3 (same).").

analyze a hostile work environment claim, the Court "must look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Gorzynski v. Jetblue Airways Corp., 596  F.3d 93, 102 (2d Cir. 2010)(quoting Harris, 510 U.S. at 23).

The Second Circuit has repeatedly held that "[i]solated, minor acts or occasional episodes do not warrant relief" under a hostile environment theory. Brennan v. Metropolitan Opera Assn, Inc., 192 F.3d 310, 318 (2d Cir. 1999)(citing Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)).  "Generally, unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Gorzynski, 596  F.3d at 102 (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)); see also  Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010)("Isolated incidents ... will not suffice to establish a hostile work environment unless they are extraordinarily severe." ); Alfano, 294 F.3d at 376 ("the twelve incidents cited by [plaintiff], taken together, [we]re insufficient as a matter of law to meet the threshold of severity or pervasiveness required for a hostile work environment"); Williams v. Cnty. of Westchester, 171 F.3d 98, 100 (2d Cir. 1999) (plaintiff must show "more than a few isolated incidents" and that "evidence solely of sporadic" discrimination does not suffice) (quotation marks and citation omitted).

Plaintiff's hostile work environment claims rest upon allegations of a few isolated incidents of comments.  As to gender based comments, Plaintiff has presented evidence

of five gender based comments by Defendant Dribble occurring over a two month period. Although the comments may be crude and offensive, they were neither pervasive nor severe.  Plaintiff's non-specific, conclusory allegation that Defendant Hilton told her "throughout the year" she had a "fat ass," while susceptible to a gender-based connotation, does not establish a pervasive or severe circumstance.  As to her disability based hostile work environment claim, Plaintiff's allegations amount to three or four comments that specifically reference her anxiety medication, and one or two additional comments that could be construed as negative assessments of her demeanor potentially caused by her anxiety, depression, or post-traumatic stress disorder or her medication. Even when taken together with the gender based comments, the comments were not severe, were not physically threatening, and amounted merely to sporadic offensive utterances.  Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).

While Plaintiff might have found the comments together with Hilton's brusque managerial style to have created a subjectively hostile atmosphere, she has not asserted conduct that a reasonable fact finder would find "'objectively' severe or pervasive - that is, [conduct that] creates an environment that a reasonable person would find hostile or abusive" such to interfere with an employee's work performance.  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); see Harrington v. County of Fulton, 153 F. Supp.2d 164, 170 (N.D.N.Y. 2001)(dismissing hostile work environment claim for failing to establish that the work environment was permeated with severe or pervasive discriminatory conduct where the plaintiff's supervisor called the plaintiff a bitch on multiple occasions, taunted her, and "continued to stare at her.");  St. Jean v. United Parcel Serv. Gen. Serv. Co., 2012 WL 71843 (E.D.N.Y. Jan.10, 2012)(granting summary judgment on Title VII hostile

work environment claim based on multiple incidents of "abusive comments, managerial discipline and close supervision" over five-year period).  Accordingly, Plaintiff's hostile work environment claims are dismissed.

### b.    Title VII Discrimination

In the Third Cause of Action,  Plaintiff asserts a claim of gender based disparate treatment under Title VII against Defendant Purcell. Title VII discrimination claims are analyzed using the burden-shifting paradigm articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  Under this analysis, Plaintiff first bears the burden of setting out a *prima facie* case of discrimination or retaliation. See McDonnell Douglas, 411 U.S. at 802.  Plaintiff's burden of establishing a *prima facie* case is *de minimis.* Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  If the plaintiff demonstrates a *prima facie* case, that gives rise to a presumption of unlawful discrimination and the burden of production shifts to the defendant who is required to offer a legitimate, nondiscriminatory rationale for its actions. See McDonnell Douglas, 411 U.S. at 802–03.  Defendant's burden of production at this stage "is not a demanding one," Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999), it need only offer a basis for the employment decision in issue which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

If Defendant proffers a legitimate, nondiscriminatory reason for the challenged action, "the presumption raised by the *prima facie* case is rebutted, and drops from the case." St. Mary's Honor Ctr., 509 U.S. at 507.  The burden shifts back to Plaintiff who

"then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, and that [unlawful retaliation] was." Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997)(*en banc*)(internal citation and quotation marks omitted), cert. denied, 522 U.S. 1075 (1998); see Stern v. Trustees of Columbia Univ. in the City of N.Y., 131 F. 3d 305, 312 (2d Cir.1997)(In order to defeat summary judgment . . ., the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."). The ultimate burden of persuasion remains always with Plaintiff. St. Mary's Honor Ctr., 509 U.S. at 507, 511. In determining whether Plaintiff can satisfy this ultimate burden, the Court must examine the entire record and apply "a case-by-case approach." Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).

To establish a *prima facie* case, Plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010). Plaintiff clearly satisfies the first two elements.

On the third element, an adverse employment action is generally characterized as a "materially adverse change in the terms and conditions of employment" and may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Zelnik v. Fashion Inst. of

14

Tech., 464 F.3d 217, 225 (2d Cir. 2006); see also La Grande v. DeCrescente Distrib. Co., 370 F. App'x 206, 211 (2d Cir. 2010) ("[a]n actionable adverse employment action is 'a materially significant disadvantage with respect to the terms of [plaintiff's] employment' ") (quoting Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004) (alterations in original)).

Plaintiff claims that one time she was given an assignment to sweep out an area alone that made her feel "isolated and ostracized;" another time she was given a similar assignment but without adequate tools to perform the assignment; she was not allowed to operate machinery; she was transferred to the higher paying brick-washing crew after she complained of working with Dibble and Hilton; and she was transferred back to the cleanup crew for one or two days after she was injured while on the brick washing crew. These do not constitute material adverse changes in the terms and conditions of her employment. An employer is entitled to assign workers where it sees fit, and the Court is not to act as a "'super personnel department' that second guesses employers' business judgments." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (citation omitted). Plaintiff has not provided evidence that she was regularly assigned the least desirable tasks, that operating machinery was part of her employment duties on the cleanup crew, or that she was otherwise required to work under materially adverse conditions. Further, at the time she was transferred back to the cleanup crew for one or two days, management had already spoken to Dibble and warned him against making sexually derogatory statements. As discussed above, Plaintiff has not presented sufficient evidence that she was subjected to a hostile work environment on the cleanup crew, and no reasonable fact finder could find that her transfer to this crew for one or two days

constituted a material adverse change in the terms and conditions of her employment. Plaintiff has failed to present a *prima facie* case of discrimination related to these circumstances because she has failed to demonstrate that they constitute adverse employment actions. La Grande, 370 F. App'x at 211 ("Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions within the meaning of Title VII.")(citing Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)).

Plaintiff's discharge from Purcell, however, does constitute an adverse employment action.  Assuming, *arguendo,* that Plaintiff satisfies the fourth element of the *prima facie* case by her proof that some male employees were hired after she was discharged, the burden shifts to Defendant to articulate a non-discriminatory reason for the employment action.  Defendant has done this by pointing to the large scale lay offs in the New York area corresponding with the ending of the project at the Fort Drum work site.  Thus, the burden shifts back to Plaintiff to provide evidence from which a fact finder could conclude that the employment determination was motivated in whole or in part by gender discrimination.  Plaintiff has not done this.

The allegedly discriminatory comments that are at the foundation of Plaintiff's claims were made by Dibble and Hilton.  Dibble was a co-worker and Plaintiff has conceded that Hilton had no authority to hire or fire.  See Pl. Dep., pp 117-118.  Further, Plaintiff has presented no basis upon which to conclude that Hilton played a role, much less a meaningful role, in the discharge determination.  See Bickerstaff, 196 F.3d at 450 (Title VII claim may be established  "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible

bias played a meaningful role in the . . . process." ).

Moreover, Plaintiff has failed to present sufficient evidence upon which to conclude that the employer held a gender bias in its retention or re-hiring practices.  Of the four members of Plaintiff's cleanup crew consisting of two females (Plaintiff and Lisa McIntosh) and two males (Hilton and Dibble), only McIntosh retained her position at Purcell after the lay offs.  Plaintiff has also failed to provide sufficient evidence from which a reasonable fact finder could conclude that she possessed adequate skills to work in the mason or dry waller positions that were filled around the time of her discharge.  Her affidavit indicates that her work history was that of a "carpenter," see Plt. Aff. ¶¶ 8, 10, and while she indicates that she had worked as "mason tender" in the past, see id. ¶ 15, the Court understands such a position to be a laborer who assists masons but who does not perform skilled masonry work. See Jackson Dep. p. 7.  Further, Plaintiff has failed to provide sufficient evidence from which a reasonable fact finder could conclude that her work on the brick washing crew, although paid at the mason's wage, involved actual masonry duties.

Plaintiff also alleges that "male workers" were treated differently than she was with regard to medical follow up treatment, but she has failed to point to a similarly situated male employee who was treatment differently than she was in this regard.  Plaintiff's "proof" of gender based disparate treatment is based upon nothing more than her conclusory speculation that she was treated in a dissimilar fashion to the male employees with regard to lay off and rehiring, with regard to job assignments, and other terms and conditions of employment.  However, Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination."  Bickerstaff, 196 F.3d at 456;

17

see id. at 448;[11] Richardson v. New York State Dep't, of Correctional Service, 180 F.3d 426, 447 (2d Cir. 1999).[12]  She has failed to provide sufficient evidence from which a reasonable fact finder could conclude that considerations of her gender motivated the employ's permanent layoff determination.  Accordingly, Plaintiff's gender based disparate treatment claim is dismissed.

### c.    ADA Discrimination

In the Fourth Cause of Action,  Plaintiff brings a disparate treatment claim under the ADA against Defendant Purcell.  The ADA prohibits discrimination against a "qualified individual [with a disability] on the basis of disability" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims alleging discriminatory discharge under the ADA are also analyzed under the McDonnell Douglas burden-shifting test. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 n. 1 (2d Cir. 2000) (ADA claims are evaluated under McDonnell Douglas); Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir.1999).  To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) her employer is subject to the ADA, (2) she is disabled within the meaning of the ADA, (3)

---

[11] As indicated in Bickerstaff, on a motion for summary judgment the Court:

must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.   This undertaking is not one of guesswork or theorization.   After all, an inference is not a suspicion or a guess.   It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

Bickerstaff, 196 F.3d at 448 (internal quotation marks and citations omitted).

[12] (affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual)

she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation, and (4) she suffered an adverse employment action because of her disability. See Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004).  The elements in dispute on this motion are two and four.

The ADA defines disability with respect to an individual as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); Buckley v. Consol. Edison Co. of N.Y., 127 F.3d 270, 272 (2d Cir.1997).  Plaintiff asserts that she suffers from anxiety, depression, and post-traumatic stress disorder for which she received treatment and takes medication, and these conditions constitute mental impairments recognized under the ADA because they substantially limit one or more of her life activities. Am. Compl. ¶ 15.  Plaintiff does not specify what major life activity is actually limited by her condition.

"[T]he determination of whether or not a person suffers from a disability under the ADA 'is an individualized inquiry' that does not rest on the mere diagnosis of an impairment." Bonilla v. Boces, 2010 WL 3488712, at *5 (W.D.N.Y. Sept. 2, 2010)(citing Sutton v. United Airlines, 527 U.S. 471, 483 (1999)).  Instead, courts are to look to "the effect of [an] impairment on the life of the individual,"  29 CFR pt. 1630, App. § 1630.2(j), and "[i]t is insufficient for individuals attempting to prove disability status . . .  to merely submit evidence of a medical diagnosis of impairment." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002).  Regulations promulgated under the ADA define "major life activities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. §

19

1630.2(I) (2004); see also Buckley v. Consolidated Edison Co. of New York, Inc., 155 F.3d 150 (2d Cir.1998) (*en banc*).  To be "substantially impaired" from performing a major life activity, a plaintiff must have an impairment that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Toyota, 534 U.S. at 197.  "The need to identify a major life activity that is affected by the plaintiff's impairment plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA."  Reeves v. Johnson Controls World Servs., 140 F.3d 144, 152 (2d Cir.1998).  Plaintiff's bald assertion that she suffers from certain mental or psychological conditions does not mean, *a fortiori*, that she is disabled within the meaning of the ADA.

Plaintiff also argues, without citation to the record, that she "has been declared disabled by Social Security and is receiving disability benefits retroactive to her date of termination" and, therefore, suffers from a mental impairment under the ADA.   Pl. Mem. L. p. 13.  However,

> in [Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 802-03 (1999)], the Supreme Court noted that because of differences in the mechanics of the [Social Security Administration ("SSA")] and ADA determinations of disability, a person could be considered disabled by the SSA but yet also fail to be substantially limited in performing major life activities according to the ADA. Additionally, the Court explained that because the SSA often uses presumptions in its disability findings, particularly by automatically finding that a disability exists if it is one of a number of "listed impairment[s]," a determination that someone is disabled under the SSA's administrative rules may not mean that [s]he is also disabled according to the ADA's more fact-intensive inquiry.

Horwitz v. L. & J.G. Stickley, Inc., 20 Fed. Appx. 76, 80-81 (2d Cir. 2001).

Because Plaintiff has not directed the Court to where in the record proof of the SSA's determination exists (if it exists at all), and because counsel's contention in the

memorandum of law is not evidence, Plaintiff has failed to provide evidence supporting her contention that her mental condition substantially limits her in performing any major life activity.  See Fed. R. Civ. P. 56(c)(3)("The court need consider only the cited materials, . . . ");  Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.")(citations omitted); see also Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 291 (2d Cir. 2000)(The Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out.")(internal quotation marks and citations omitted); NYND LR 7.1(a)(3)("The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs.").[13]

Plaintiff also argues that she was discharged because she was perceived as being unable to get along with others, and, therefore, she was regarded as substantially limited in this "necessary work skill."  Pl. Mem. L. p. 13.  This is insufficient to withstand summary judgment.  "[W]ith respect to any claim of disability prior to January 1, 2009, where the claim is one of being perceived as disabled, plaintiff must show that the employer regards the plaintiff as disabled within the meaning of the ADA, and not merely that plaintiff is regarded as having some measure of a disability or impairment."  Brtalik v. S. Huntington

---

[13]The Court will not countenance a "shot gun" approach to litigation where a party files numerous documents, including complete deposition transcripts, fails to identify where proof of a stated fact exists in the record (if it exists at all), and then argues on reconsideration: "It was in the record ."

Union Free Sch. Dist., 2010 U.S. Dist. LEXIS 107373, at *24 (E.D.N.Y. Oct. 6,

2010)(citation omitted); see Giordano v. City of New York, 274 F.3d 740, 747-48 (2d Cir.

2001)(Plaintiff must show not only that the defendants regarded her as somehow

disabled, but that they regarded her as disabled within the meaning of the ADA.); see also

Laurent v. G & G Bus Service, Inc., 2011 WL 2683201, at *5-*6 (S.D.N.Y. 2011).[14]  "In

other words, a plaintiff stating this sort of claim must show that the employer regarded her

as having 'a physical or mental impairment that substantially limited one or more [of the

plaintiff's] major life activities.' 42 U.S.C. § 12102(2)(A) (2006)." Eaddy v. City of

Bridgeport, 2011 WL 1399031, at *4 (D. Conn. Apr. 12, 2011).   An impairment

"substantially limits" the major life activity of working if an individual is "significantly

restricted in the ability to perform either a class of jobs or a broad range of jobs in various

classes as compared to the average person having comparable training, skills and

abilities." 29 C.F.R. § 1630.2(j)(3).  "The inability to perform a single, particular job does

not constitute a substantial limitation in the major life activity of working." Id.

     Plaintiff testified that her mental condition, and the medication she was on, did not

---

[14]The District Court wrote in Laurent:

[T]he ADA was recently amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub.L.
No. 110–325, 122 Stat. 3553 (2008). The ADAAA sets forth a new standard for determining
whether a person is "regarded as having such an impairment":

    An individual meets the requirement of "being regarded as having such an impairment" if the
    individual establishes that he or she has been subjected to an action prohibited under this
    chapter because of an actual or perceived physical or mental impairment whether or not the
    impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).   However, the ADAAA only applies to claims arising on or after January 1,
2009.

Laurent v. G & G Bus Service, Inc., 2011 WL 2683201, at *5-*6 (S.D.N.Y. 2011).

affect her work performance. Pl. Dep. 139, 200.  Thus, assuming *arguendo* that there was a perceived connection between Plaintiff's mental impairment and her inability to work well with others, the inability to perform this individual "work skill" does not constitute an impairment of a major life activity such to qualify under the ADA.  See Bonilla, 2010 WL 3488712, at *6.  Further, there is insufficient evidence that the employer regarded her as having an impairment that limited any other life activity. Id.

For these reasons, Plaintiff's ADA disparate treatment discrimination claim is dismissed.

### d.    Retaliation

Plaintiff's Fifth and Sixth Causes of Action assert claims of retaliation under Title VII and the ADA against Defendant Purcell.  Both claims are analyzed under the burden-shifting framework set forth in McDonnell Douglas. See Platt v. Incorporated Village of Southampton, 391 Fed. App'x 62, 64 n. 1 (2d Cir. 2010).  The essence of a retaliation claim is that the employer took an adverse employment action against an employee motivated in part because the employee engaged in protected activity by opposing an unlawful practice.  It does not matter whether the complained of conduct actually violated the law so long as the employee believed in good faith that it did. See Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) ("A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful, so long as he can establish that he possessed some good faith, reasonable belief that the underlying challenged actions of the employer violated the law) (internal citations omitted).

Here, Plaintiff complained, *inter alia*, to Sandra Crabb in April 2008 about "everything" that had occurred to her, and asked whether Purcell's insurance would cover a psychiatrist and/or therapy because of the conduct Plaintiff experienced at the job site. A reasonable fact finder could conclude that the complaint was of what Plaintiff reasonably believed was Title VII and ADA harassment.

A week before Plaintiff was discharged, James Kingsley, the Personnel Director of Purcell, called Plaintiff into his office and asked about her medication and whether it made her "all weird." Plaintiff advised Kingsley that she was "fine" on her medication but reported that "bad things had been said to [her] and that [she] did not want to be put back on the crew with Defendants Dibble and Hilton." She would not tell Kingsley what had been said because she feared retaliation from Hilton or Dribble, but she told Kingsley that she wanted to be left alone and treated with respect. Again, this could be interpreted as a complaint by Plaintiff of what she believed was Title VII and ADA discrimination.

After Plaintiff was discharged, she was told by Christina Schneider, Purcell's Chief Financial Officer, that her layoff was permanent because she "could not get along with others." A reasonable fact finder could conclude that Plaintiff's inability "to get along with others" was simply another way of saying she complained too much. Thus, a fact finder could conclude that Plaintiff's permanent discharge, as opposed to the circumstances of her female co-worker Lisa McIntosh, was because Plaintiff complained of what she believed was Title VII and ADA harassment. Accordingly, Defendants' motion to dismiss the Fifth and Sixth Causes of Action is denied.

### e.     Tortious Interference with Contractual Relations

Plaintiff asserts in the Seventh Cause of Action that Defendants Dibble and Hilton "misrepresented Plaintiff's job performance and falsely and fraudulently reported that Plaintiff had problems getting along with her co-workers because of Plaintiff's sex and/or disability and/or in retaliation for complaining of discrimination."  Am. Compl. ¶ 47.  While Plaintiff asserts in the Amended Complaint that "Defendants' actions constituted an interference with Plaintiff's contractual rights in her employment with Purcell," Am. Compl. ¶ 48, she concedes in her Memorandum of Law that no contract existed between her and Purcell.  See Pl. Mem. L. p. 23 (A tortious interference claim may be sustained "even though Plaintiff had no express written contract.").

Under New York law an at-will employee may maintain a tortious interference claim in "certain limited situations," but "she must establish that a third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats." Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001) (internal quotation marks omitted); see also Scutti Enters., LLC. v. Park Place Entm't Corp., 322 F.3d 211, 215 (2d Cir. 2003)("To state a claim for tortious interference with [non-contractual] business relations under New York law, four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship.") (internal quotation marks and citation omitted).  In support of her tortious interference claim, Plaintiff cites to pages 13-16 of Dave Jackson's deposition transcript for the proposition that "Defendant Hilton and others complained about Plaintiff's work performance unjustifiably . . . thus linking Defendants' complaints

about her with the loss of her job." Pl. Mem. L. p. 22.   However, a review of Jackson's deposition indicates that "everyone who worked around Plaintiff . . . complained about [Plaintiff's] work performance," including Lisa McIntosh and Hilton. Jackson Dep., p. 13. These people said that "it was hard to work around [Plaintiff] sometimes because she would talk a lot," but Jackson did not report these complaints to anyone and he did not have the power to effectuate Plaintiff's termination on his own. Id. pp 13-17.[15]  Plaintiff has failed to adduce sufficient evidence from which a reasonable fact finder could conclude that either Hilton or Dibble used wrongful means to effectuate her termination. Accordingly, the Seventh Cause of Action is dismissed.

### e. *Prima Facie* Tort

The Eighth Cause of Action asserts that "[t]he actions of Defendants Dibble and Hilton were intentional and inflicted harm upon the Plaintiff, costing Plaintiff her job at Purcell," Am. Compl. ¶ 51, and that "Defendants' actions were driven by malice and ill will toward Plaintiff and were not justified." Id. ¶ 53.  Plaintiff contends that Defendants' actions caused her to sustain "economic losses . . . by reason of [her] termination of her employment." Id. ¶ 54.

"A cause of action for a *prima facie* tort requires a showing of '(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful.'" Field Day, LLC v. Cnty. of Suffolk, 2011 WL 2580340, at *13 (E.D.N.Y. June 28, 2011)(quoting Curiano v. Suozzi, 63

---

[15]The only indication of a report made by Jackson to a supervisor of anything concerning Plaintiff contained in the cited deposition pages is when Jackson reported Dibble's "cunt" statement to Moser. See Jackson Dep. pp. 13-16. However, at the time, Jackson was not a foreman but rather a "team leader [that] didn't really have control over people" but simply did "[w]hatever [his] supervisor told [him] to do for the day." Id. pp. 16-17. Moser was Jackson's supervisor as well as the supervisor for the cleanup crew. Id.

N.Y.2d 113, 117, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984)).  As indicated above, there is insufficient evidence upon which a jury could conclude that Dibble or Hilton had any involvement in the employer's decision to discharge Plaintiff.  Thus, there is no basis to hold these Defendants liable for the asserted damages stemming from the alleged tort.

Moreover,  "[a] critical element of a *prima facie* tort is that the plaintiff suffered specific and measurable loss, which requires an allegation of special damages." Gilani v. Nat'l Assoc. of Secs. Dealers, Inc., 1997 WL 473383, at *15 (S.D.N.Y. Aug.19, 1997) (citing Freihofer v. Hearst Corp., 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985)). "Such damages must be alleged with sufficient particularity to identify actual losses and be related causally to the alleged tortious acts." Epifani v. Johnson, 65 A.D.3d 224, 233, 882 N.Y.S.2d 234, 242 (2d Dept. 2009) (citations and internal quotation marks omitted).

Plaintiff has not alleged or particularized special damages in the Eighth Cause of Action.  The Amended Complaint's *ad damnum* clause provides no further particularization as to the special damages purportedly caused by Dibble and Hilton's alleged *prima facie* torts.  Rather, Plaintiff broadly seeks, against all Defendants on all causes of action, "judgment awarding Plaintiff compensatory damages in an amount not less than $500,000 . . . [and] punitive damages in an amount not less than $3,000,000.00."  Am. Compl. p. 9. This fails to satisfy the particularity requirement for pleading special damages under New York law, see Frank v. Walgreens Co.,  2011 WL 4465210, at *8 (E.D.N.Y. Sept. 26, 2011)("A 'general damages claim' for prima facie tort that is identical to claims made for each of plaintiff's other causes of action 'is not stated with enough particularity to constitute an adequate pleading of special damages as required under New York

27

law.'")(quoting <u>Gilani</u>, 1997 WL 473383 at *15 (collecting cases)), and Plaintiff has failed to provide evidence on this motion curing this defect.  Accordingly, Plaintiff's Eighth Cause of Action is dismissed.

### f.    Punitive Damages

Finally, Defendants move to dismiss Plaintiff's claim for punitive damages.

Defendants argue:

> In the Amended Complaint, Plaintiff makes a simple, conclusory request for punitive damages in the *ad damnum* clause.  There is no indication what claims punitive damages are sought under, and no allegations are made in order to support the assessment of punitive damages in this matter. . . . There are no allegations in the Amended Complaint that Defendants acted recklessly or with malice towards Plaintiff.[16]  Further, . . . there is no evidence to support a finding that Defendants acted recklessly or with malice.

Def. Mem. L. p. 22.

Plaintiff counters that whether or not Defendants acted in a manner such to support a demand for punitive damages is a question of fact that cannot be decided on summary judgment.  Pl. Mem. L. pp. 24-25.

The Court agrees with Plaintiff's proposition that the question of intent cannot be decided on summary judgment, but a more fundamental question presents itself.  At this stage, the only remaining claims to which punitive damages could apply are the Title VII and ADA retaliation claims.  Punitive damages may be sought for the Title VII retaliation claim, <u>see</u> 42 U.S.C. § 1981a(b)(1), but it appears to be "an open question in this circuit whether a plaintiff can seek punitive or compensatory damages for a violation of the

---

[16]Defendants also assert in their Memorandum of Law: "In order to obtain punitive damages in Title VII and ADA claims, Plaintiff must demonstrate that the defendants acted 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Def. Mem. L. p. 22 (quoting <u>Kolstad v. American Dental Association</u>, 527 U.S. 526, 529-530 (1999)).

anti-retaliation provisions of the ADA." Infantolino v. Joint Industry Bd. of Elec. Industry, 582 F. Supp.2d 351, 362 (E.D.N.Y. 2008).  Several courts have held that, perhaps because of Congressional oversight, the ADA does not allow for recovery of punitive or compensatory damages for a violation of its anti-retaliation provisions. See Alvarado v. Cajun Operating Co., 588 F.3d 1261, 1269-70 (9th Cir. 2009)("We hold, as did the Seventh Circuit in Kramer, that the plain and unambiguous provisions of 42 U.S.C. § 1981a limit the availability of compensatory and punitive damages to those specific ADA claims listed.  ADA retaliation is not on the list."); Kramer v. Banc of America Securities, LLC, 355 F.3d 961 (7th Cir. 2004), cert. denied, 542 U.S. 932 (2004)(holding that a plaintiff can only recover equitable relief for a retaliation claim under the ADA); Infantolino, 582 F. Supp.2d at 362 ("I . . . conclude that compensatory and punitive damages are not available for claims brought pursuant to the anti-retaliation provisions of the ADA. . . . Though I have little doubt that this gap in the remedies available to ADA retaliation plaintiffs is the product of congressional oversight rather than congressional design, I am equally confident that only Congress can properly fill it."); Sink v. Wal-Mart Stores, 147 F. Supp.2d 1085, 1101 (D. Kan. 2001) ("While the court can discern no logic in a rule that precludes an award of compensatory and punitive damages in an ADA retaliation case when such damages are available in Title VII retaliation cases, the court is nonetheless confined to the construction of the statute."); see also 2 AMERICANS WITH DISAB.: PRACT. & COMPLIANCE MANUAL § 7:442 (West. 2012)("Punitive damages are not available for a violation of the ADA's retaliation provision (42 U.S.C.A. § 12203)."); but see Muller v. Costello, 187 F.3d 298 (2d Cir.1999) (upholding a compensatory damages award under the ADA's anti-retaliation provision without analyzing the issue); Lovejoy-Wilson v. Noco

Motor Fuels, Inc., 242 F. Supp.2d 236, 241 (W.D.N.Y. 2003) (holding that compensatory and punitive damages are available to remedy an employer's retaliation based on a prior complaint of disability discrimination); Edwards v. Brookhaven Sci. Assocs., LLC, 390 F. Supp.2d 225, 234 (E.D.N.Y.2005) (allowing compensatory damages for ADA retaliation based on Muller).  Because this issue was not addressed by the parties, the Court will deny the motion but grant leave to Defendant Purcell to renew its motion on the issue of appropriate damages that may be recovered on Plaintiff's ADA retaliation claim.

## V.      CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment [dkt. # 42] is **GRANTED IN PART AND DENIED IN PART**.   The motion is granted in that all claims against all defendants, except the Title VII and ADA retaliation claims against Defendant Purcell Construction Corp., are **DISMISSED**.  That part of Defendants' motion for summary judgment seeking to dismiss Plaintiff's Title VII and ADA retaliation claims against Defendant Purcell Construction Corp., and Plaintiff's demand for punitive damages related to these claims, is **DENIED**.  Defendant Purcell is granted leave to renew its motion on the issue of appropriate damages that may be recovered on Plaintiff's ADA retaliation claim.  The renewed motion, if it is made, may be in form of a motion *in limine* provided it is filed twenty (20) business days in advance of the date of trial, in which case Plaintiff shall file a response, if any, ten (10) business days in advance of the date of trial.

**IT IS SO ORDERED.**

**Dated:**  March 13, 2012

Thomas J. McAvoy
Senior, U.S. District Judge